Again, good morning, your honors. My name is John Kress. I represent the appellant, the plaintiff below in the district court, Christine Vitello, in this putative class action. I would request that you need to speak up a little bit for me. Thank you, your honor. I would request that I have four minutes for rebuttal. This particular case is about a supplement that are regulated by the FDA that are commercially available across the United States, Walgreens, Target, Walmart, etc. This particular supplement is called Cognium and that's what Natrol does. They sell supplements. And this case is about Natrol lying on the labeling, on the packaging of the Cognium. The Cognium's representations are it's supposed to make you smarter. It's supposed to improve your memory and your concentration. And so we filed this action back in 2018 and the primary allegation that we had raised was a violation of the MMPA for fraud. And what ended up happening in this particular instance and resulted in this appeal being filed and made is that the district court below, without any legal authority, determined that because of the labeling that is mandated and required by the FDA, and also from a disclaimer placed on that supplement by the defendant, that because of those two labels, she was unable to sustain a cause of action. She could not show an ascertainable loss. And in a sense to what we had discussed and argued was she had no standing to bring the claim, thereby dismissing her on summary judgment. In other words, the court was applying a recognized element for MMPA liability. Your Honor, the standard, the court went under the MMPA, but unfortunately for the court, it's not the law in the United States or in Missouri or in any other jurisdiction. I don't believe the United States. It's not a federal statute. Your Honor, there is no case law. The benefit of the bargain is not under Missouri law recognized? Your Honor, the benefit of the bargain is recognized. In this instance. What's the issue? The benefit of the bargain is Ms. Vitello purchased the natrile cognium at a Walmart. At the time that she purchased that cognium, the labeling said there are nine clinical studies. This was part of the label. It says, clinically proven to improve memory and concentration. Nine clinical studies in adults, seniors and children showed statistically significant improvements in memory and cognition in four weeks or less when taken as directed. You're not talking about the bargain. You're talking about the misrepresentation. The misrepresentation. That's all right. You can start where you want. I wanted to talk about the bargain. In what sense? The benefit of the bargain was she purchased it and there was a misrepresentation of the MMPA. She purchased it for a purpose that was explicitly, it wasn't disclaimed. She was told, you can't get this for it. The value wasn't zero and zero. I think the district court might have suggested. Your Honor, the value for her when she went up and purchased it at Walmart was zero because they said there were nine clinical studies and two of them had been removed and rejected for fraud and data fabrication. She didn't know this. She found this out later. That is my view. That's not the bargain. The bargain is the value that she got versus the value she intended. The value that she got was zero. She intended to purchase Cognin that had nine clinical studies. What is the evidence for that value being zero? I hear you trying to highlight the idea that she bargained for a product that was supported by nine studies and that she got a product that was supported by seven studies. What evidence do we have that the loss of two of those nine studies rendered it a value of zero? She made it very clear in her deposition testimony that had that labeling said two of these studies were retracted for fraud and data fabrication, she would never have purchased the Cognin. The question Judge Loken was asking you is that the judge, the district court, focused not on the nine versus seven studies, but on the fact that she, by her own testimony, purchased it and used it for an off-label use, which is to treat ADD, which it says it does not do, and she went off her medications. What is your response to the court focusing on that as the benefit of the bargain? That doesn't have, in terms of how it impacts the benefit of the bargain, that FDA label is placed there for the protection of the consumer, not the protection of the defendant. Forget about why the label is there. It's there. It's factually there to advise consumers. That is correct. It's there to advise consumers. So why isn't it relevant to the bargain? Forget about whether it's FDA or whoever put it on there. We can't forget about whether or not the FDA puts it on there, because that's the whole reason it's there. You're not arguing Federal law, counsel. You're arguing Missouri law. I'm arguing Missouri law, but that FDA label is placed there, not because of Missouri law, but because of Federal law, regulations that go back to 1906. What's the relevance? I don't understand the relevance of that. Well, the problem here is that that FDA, if I may, if you may indulge me on this issue, is that the disclaimer, the two disclaimers that the judge found probative in her ruling, the first one is the FDA. It says these statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, prevent any disease. The second disclaimer is one that most supplements have on their bottle. They're self-serving from most of these corporations. And this one said, consult your health care professional prior to use if you have or suspect a medical condition, are taking prescription drugs, or if you are pregnant or lactating. And the problem here is that the FDA disclaimer is simply there to protect the consumer, to help the consumer to also remind them that this isn't a drug that requires a prescription. This is simply a supplement. Well, it does more than that. It specifically says it isn't intended to treat any illness. She testified she purchased it to treat her illness, a use for which it was expressly disavowed. People across the United States purchase supplements. It's a multi-billion dollar industry at this point in the year 2022. St. John's wort is used for depression. People will purchase fish oil, such as I do, for high blood pressure. There's a supplement for anything. If you have insomnia, you can get melatonin. There's all kinds of things that people... What if you buy one of those for something that's... what if she bought this for pain relief? If she bought this for pain relief? If she had bought this... well, the natrile cognum is not for pain relief. Right, but... But she was just asking me hypothetically if she bought something... bought a supplement for pain relief. But the two of the clinical studies were fraudulent, so I bought it based on those clinical studies. She bought it based on the representations on the label, and that's where the fraud and that's where the violation of the MMPA occurred. At the time that she looked at the packaging, she read it, and she purchased it. She would not have purchased the cognum, or in this case, as your hypothetical, a pain medication... So it has to be related to memory, though, right? I'm sorry, Your Honor? But she bought it for memory. She bought it specifically for her memory. She bought it specifically looking for a substitute for the Adderall. Not unlike many Americans, not like many people here in the state of Missouri, looking for something that would help her that would not be a prescribed medication. So the tension here is if you take this holding, you take this ruling from the district court, which isn't supported by any other districts in the United States or circuits, what this stands for, the proposition is that if you have a consumer protection claim and you don't consult with your physician, and if you don't consult with that physician and you have something, you have a diagnosable medical condition or perhaps one... Not just any, but the very one she is taking this product to fix. Correct. So this isn't a situation where someone also has diabetes, purchases St. John's Wort for pain, doesn't talk to their doctor. This is one where she purchased this to help her ADD, which is a diagnosed medical condition, and the box told her she couldn't do that. The box tells everyone they can't do that, and they do that anyway because it's not a prescription. You don't need a doctor. You could send your child... So you're saying that some of these have to be strictly interpreted, like the nine versus seven, and others can be disregarded in our analysis, like they don't use this to treat a medical condition. I disagree with the way you are viewing that, and that contention is that this is designed, the labeling is designed to protect the consumer, not shield the corporation from its lies, from its malfeasance, and from its fraud. So what essentially is happening here is that the defendant is saying, okay, well, we've got these labels that we're required to put on here, but ignore the fraud on the label because, well, it says it can't treat any illness or disease. But the ultimate reality is that if you take this, and this becomes the new standard for these consumer protection cases that involve these supplements, you're going to find this tension where you're going to find someone going in to see their physician. So this is what was not thought through, is that if she had gone to her physician, the physician could have said, well, yes, you do have ADD. Well, you're seeing me and you're consulting. Does the record show whether Cognium was cheaper than Adderall? No, it does not, Your Honor. But I would hazard a guess that it is. I wager I know the answer to that. I would hazard a guess that it is cheaper than the Adderall, definitely. But if she went to talk to her doctor and said, well, I'd like to substitute this for Adderall, then the physician would look on the box and say, well, it says here from the FDA label that, you know, it's not intended to treat a disease or a defect. So it creates tension for the physician. What do they put in the chart? Can they actually tell the patient, well, go on ahead and take this supplement, even though it says it's not for ADD or anything that's diagnosable? Adderall is prescribed. Correct, Your Honor. It is prescribed, and this is not. Cognium is over the counter. Yes, sir. And so she substituted a cheaper over-the-counter without consulting her physician, the physician who prescribed Adderall, whether that was a good idea. She took a supplement that she was allowed to purchase just like anyone else in the United States without consulting with her physician because it did not require a prescription. It did not require her to consult with her physician in order to take this. We're talking about tort liability now. We're not talking about whether she did anything wrong. We're talking about third-party tort liability. What we're talking about, their liability under the ‑‑ I'm sorry, defendant's liability under the MMPA. We're talking about the fraud. We're talking about the label. We're talking about the fraudulent studies that were attracted, that they did not share with the consumer or disclose on the box, that she clearly ‑‑ I see I'm running into my rebuttal time, and I'll try to wrap up. Her loss occurred at the time of the purchase. Had this defendant disclosed that these studies had been retracted, there's no way she would have purchased this product. And the court is misguided in the sense that they are focusing on the FDA's label and its own disclaimer instead of focusing on the defendant's fraud. In a sense, they're using this FDA label as an excuse to shield or to protect the defendant from liability and to keep other consumers from doing so as well. And I go back to the example I gave, the hypothetical, what would happen if she had gone to see a physician or anyone in the state of Missouri had gone to see a physician? I could see some doctors saying, well, I can't tell you to take this. I don't know how to put this in a chart. It says it's not to treat something, but we all know that the fish oil, if you have high blood pressure, go on ahead and take it. I don't know how to tell you that. You've talked to me. Maybe I chart it. Maybe I don't. But this has not been thought through in terms of how this ruling will affect other consumers. So in order for them to have a cause of action after this case, if this is not sent back and remanded with a ruling that shows the court that there was an ascertainable loss. I have a question on that. Well, you can keep going. I have a question about your unjust enrichment claim, which if you can finish the last thought. The district court kind of treated the two as the same, but it seems to me they're not necessarily the same. The unjust enrichment is kind of a rescission remedy, as I would view it. That's right. All right. So my question is, why doesn't the money-back guarantee, which your client declined to pursue, demonstrate that there was no unjust enrichment in keeping the purchase price? And, Judge Loken, I think that's an excellent question. But what the cases also show is that that particular issue, the money-back guarantee, was litigated early on in the case in the motion to dismiss. It's not a motion to dismiss question. I understand that. But they're not permitted to use the money-back guarantee, again, to avoid liability under the statute, under those regulatory schemes, under the common law. We're talking about a common law unjust enrichment claim, right? Yes, Your Honor. And that requires a fact finding under Missouri law that there was an unjust. It was not only an enrichment, but it was unjust. Yes. And here the enrichment was they're keeping the purchase price. Yes. And your client had an absolute right, contractual right, to get it back. So where is the unjust enrichment? Where is the unjust enrichment? That also goes to the representations that the defendant made at the time of the purchase. I don't think so. But all right. If that's your only answer, fine. All right, Your Honor. Thank you. I see my time, my 17 seconds. Thank you so very much. Thank you. Appreciate things today. Mr. Scarborough? Good morning. May it please the Court. My name is Larry Scarborough. And along with Desmond Bennett, we represent NATROL LLC, the appellee in this case. I want to start by saying that I'm rarely accused of speaking too softly. So if I get too loud, please tell me to tone it down a bit. Let me start with the focus of the Court's question, which is the benefit of the bargain, which, as the Court well knows, is the sine qua non of ascertainable loss under MMPA law. You heard counsel say it here today. The benefit of the bargain, from Ms. Vitello's perspective, was to replace prescription Adderall for her ADD with the Cognium. Now, I want to step back and underscore that those facts that underpin that are undisputed as a matter of law, not because they all come from Ms. Vitello alone, but also because they're in the undisputed statement of material facts in support of the summary judgment motion, which was not controverted at any point by plaintiffs in this case, and so are deemed undisputed for purposes of summary judgment and on this appeal. Is there a distinction between taking something like Adderall to fully treat a particular issue like ADD and someone wanting to address the symptoms of that problem? I think opposing counsel mentioned things like fish oil that people take because they have some issues they want to address that's not prescription. It seems like there's a lot of things people take to address symptoms of a bigger problem. Is that a distinction that matters here? In other words, her bargain could be, you know, viewing it all in the light most favorable to her, that her bargain in her mind was, I'm going to buy this to treat one symptom of ADD. I mean, I'm not a physician, but I don't think memory is the only problem that would be associated with that diagnosis. Is that a way to look at the benefit of the bargain here? Your Honor, it might be a way to look at the benefit of the bargain. I don't really know the ultimate number of hypotheticals that might be spun out of this, but what we have in the record is from Ms. Vitello herself who made it clear it was memory. If I can push it back a little bit on the hypothetical, I'm suggesting that maybe it's not a hypothetical. What I'm asking is, is there a way to read her testimony to say, yeah, I want to treat my ADD, but I don't think memory is the only issue that someone who's been diagnosed with ADD struggles with. And so is there a way to read the testimony, as you have presented as undisputed, as her wanting to treat one portion of this diagnosed problem that she had? We can't get into her head. We all know that. All we can do is listen to what came out of her mouth in her sworn deposition where she said the reason was memory. And so there's no daylight from our perspective based on her words, not our supposition, not our embellishment, not anything else. So you don't think there's a difference between memory and ADD? I'm not a physician. I mean, it's an honest question. I'm trying to sort of parse this out because I'm just trying to figure out exactly what it is that she was thinking was her bargain. I can imagine that ADD is broader, all things considered. We know that many conditions run across a spectrum of things. But we also know, importantly and dispositively for purposes of this appeal, that her issue was memory. And you can go into the deposition transcript and talk about her testimony going to a recipe on a back island, turning around and coming to the ingredients and not remembering what she had just read in the book. Every situation and the summary of her testimony in her own words was that she was trying to use cognium to replace ADD to substitute for the memory issues she was having with ADD. That's what was explored in the deposition. That's what she said. That's the best I can do on that, Your Honor. It seems like there's a temporal issue between you and opposing counsel or between the parties here. With respect specifically to the MMPA claim. And that is that the plaintiff is taking the position that the injury was the false characterization of nine studies instead of seven. It feels like false is undisputed at this stage. Two studies being retracted. That she purchased the product based on the falsehood and that the injury was concluded basically when she handed her cash over. You and the district court focused on the injury being that the product could not do what she wanted it to do. And I apologize if I mischaracterize it. Because she had ADD, she wanted it to treat ADD in her position. And it said on its package it couldn't do it. What is wrong with the other side's argument that the harm was done before we get to any of that? That aside from her medical condition, the minute she bought a product in reliance on a lie, the MMPA was violated. There are several answers to that question, Your Honor. The first goes back to a discussion that was had when my colleague was before you. Which is the wrongful conduct is a misrepresentation question, a separate element from ascertainable loss under long-held Missouri law on that topic. But to your precise question, there isn't a temporal distinction. Because it's clear under Missouri law that it is to be adjudged at the time of the purchase. The court below wrote, addendum page 15, certainly talking about the unjust enrichment claim, which I'll get to in a minute, that that is the time period. And it's because the benefit of the bargain occurred because she had read the representations, disclaimers, if you will, on the bottom, on the bottle, on the box, on the pamphlet, before she ever took the cognium. So from her perspective, she knew all of that at the time. The court's question focuses on the 9 verses 7 issue. And there are two important parts. For purposes of the MMPA, that's a misrepresentation question and is legally distinct from the ascertainable loss question, which focuses on benefit of the bargain. Why isn't her loss the purchase price of the product? If we're talking about what is the loss from the wrongful conduct, wrongful conduct is the false statement on the labeling. The loss is I wouldn't have bought it. My loss is $20. She had to show that that bargain at the time it was made rendered or conferred less value than it would have been as represented. The 9 and the 7 for MMPA purposes has nothing at all to do with the fact that the reason she took it in the first place was to replace the Adderall for ADD. There is a connection on unjust enrichment. And I absolutely want to say that as an adequate independent ground, the refund, which is in our brief and was argued below but was not adopted by the district court, is absolutely an issue. But when you get to the third element of unjust enrichment, which is the unjust retention of the money by NATROL, it does hook back in to as a result of what? And she does say as a result of the 9 versus 7 issue. And there the court below correctly held on undisputed evidence that that 9 versus 7 was unconnected to the unjust retention of the benefit because she took the Cognium hoping to replace insofar as memory is concerned. The Adderall for ADD. So why do we focus? Help me understand. You focus on her testimony of why she was going to take the Cognium. But then we don't focus on her statement that said, I would not have bought this product, just this product, had the false statement about the clinical trials not been on that. And as I understand the MMPA, the foreseeable use of the product, none of that really matters because it's focusing on the fraud. So why don't, how can we sort of skip over that part of her testimony when to follow up on Judge Menendez's question about what the actual bargain was that she's testified to? The 9 versus 7 as a reasonable consumer test, which is the test under the MMPA broadened out, is absolutely the subject of summary judgment proceedings in this case. Of course, it wasn't what the court below focused on as it sifted through the fully briefed certification summary judgment submissions, the lack of a dispute of the material facts, the lack of an adequate countervailing affidavit suggesting what discovery might undo the admission she made. So that is certainly an issue. But in terms of parsing claims for summary judgment and looking at the burden placed squarely on the plaintiff to come forward to meet the constituent elements to avoid summary judgment, she chose, justifiably in our view, the MMPA's ascertainable loss because of this disconnect between the fact that there couldn't be, could not be as a matter of law based on undisputed facts, the benefit of a bargain where someone tried to use Cognium to replace Adderall in the face of everything that she knew and she read and testified she was not surprised to see, given that this was a dietary supplement and not a prescription pharmaceutical prescribed by a medical provider. So I see I have time remaining. I would only add, again, the undisputed nature of all of this and the fact that unjust enrichment claims as a matter of Missouri case law tend to follow in their rejection cases in which ascertainable loss is absent. But beyond that, as I've already explained and I will not repeat myself, the unjust retention of the benefit is absent here based on the alleged wrongful conduct. That's all within the plaintiff's control as to how they wish to present the case. So unless the court ‑‑ I have a question for you, sir. Sure. You throw in a footnote at page 20 of your brief about changes made to the MMPA that aren't applicable here. They're not retroactive. You acknowledge they're not retroactive. What ‑‑ why do you do that? Like, why do you include them? What meaning, what weight do you expect me to give them? The fact that later the legislature decided to change the law seems to have no bearing on how we interpret the law as controls this case. What are you expecting us to do with footnote two? We're expecting you to do nothing. So why did you put it in? I'll answer the question. Okay. The appellant dropped a footnote in its brief saying there had been fairly substantial changes to the law. We felt it might be helpful to the court to know what those were. So we dropped a footnote in response and explain for the court what they are. Clearly not applicable, but we thought more disclosure was better than no disclosure. Pure and simple. That's it. Okay. Thank you. All I'll say is we ask the court to affirm the judgment in Nate Troll's favor below. Thank you very much for your time and attention. Thank you. Thank you. Is there a ‑‑ I'll give you a minute for rebuttal. May I have a rebuttal? In closing, your honor, your honors, if this is going to be upheld, the tension that is created is that we now are in a time where there is such distrust among certain segments of our population here in Missouri and other states of science and medicine. There are people who will outright refuse to see a physician or will ignore a physician's advice. The problem with this ruling, if it is not remanded and sent back, is the message in the signal in the ruling for corporations is that it now requires consumers to go to their physician who they may not trust, and that's one of the reasons why they've purchased the supplement. Because they don't want to deal with the physician. They've seen something or heard something, so they want to try a different remedy. But under this new rubric, there will be no remedy if there's snake oil that's promulgated and there are mislabeling and there are outright lies being promoted to people and then they're falling for it, so to speak. I see that I'm out of time. Thank you, your honors. Thank you, counsel. Thank you, counsel. The case has been thoroughly briefed and argued, and the argument's been helpful. We'll take it under advice.